UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ACCURATE ABSTRACTS, LLC,

Plaintiff,

v.

HAVAS EDGE, LLC,

Defendant.

Civ. No. 14-1994 (KM) (MAH)

OPINION

### KEVIN MCNULTY, U.S.D.J.:

This action arises from a Statement of Work ("SOW")[1] in which Plaintiff Accurate Abstracts, LLC ("Accurate") engaged Havas Edge, LLC ("Havas") to build a website for Accurate. Each party alleges that the other has failed to perform its obligations under the Statement of Work. Pending before the Court are dueling motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Each party has moved for summary judgment in its favor on Accurate's breach of contract claim and Havas's breach of contract counterclaim.

### I. BACKGROUND

This Opinion assumes familiarity with the prior opinions filed by me and by Magistrate Judge Hammer. I highlight here the facts pertinent to resolution of the parties' cross motions.

---

[1] The Statement of Work [DE 77-7, Exh. D] will be cited as "SOW [page no.]."

1

### A. The parties and their prior dealings

Accurate is a family-owned title search company. (DE 77-2, ¶ 3). Havas is an agency with expertise in marketing, website development, and analytics. (DE 77-2 at ¶ 2).

Accurate was experiencing crashes and other serious technical problems with its computer operations. In March of 2012, Accurate hired Havas to stabilize the source code and database connected to its title search website (also referred to as "the application").[2] (DE 77-2 at ¶¶ 5, 11).

In July of 2012, Accurate hired Havas again, this time to provide maintenance and support to its database. (DE 77-2 at ¶ 13). Throughout this time, Accurate's earlier technical problems continued. (DE 77-2 at ¶ 16).

### B. Contract formation

On or about September 17, 2012, Accurate and Havas met in person to discuss a rebuild of Accurate's website. (DE 77-2 at ¶ 18). Accurate's three principals were in attendance: Dolores Dios ("Dios") and her sons Sean Flanagan ("Flanagan") and Matthew James Dios Price ("Price"). (DE 77-2 at ¶¶ 6, 18). Havas was represented by Brian Hall ("Hall") and Andy Kling ("Kling"). (DE 77-2 at ¶ 18). During this meeting, either Hall or Kling provided a range of costs to rebuild Accurate's website. Accurate contends that Havas estimated it would cost between $350,000 and $850,000 to complete a brand new rebuild of the website with improvements, and that such a rebuild would take six to eight months (DE 98-6 at ¶¶ 368, 369). Havas asserts that the dollar range was limited to the cost of rebuilding the website without improvements. (DE 77-2 at ¶¶ 23–25). Its representative cannot recall the specifics of the "ballpark figures" given. (DE 96-1 at ¶ 368).

Havas asserts that, while negotiating the SOW, Havas explained to Accurate that it was not possible to estimate a "specific dollar amount" or "specific time"

---

[2] Unless otherwise noted, all citations to Havas's Statement of Undisputed Facts refer to facts that have been admitted by Accurate.

2

for the project. (DE 77-2 at ¶ 42). Accurate, however, says that "Havas repeatedly provided estimates about the total cost and duration of the project, which Accurate Abstracts relied upon in deciding to hire Havas." (DE 83-2 at ¶ 42).

On September 27, 2012, the parties executed an agreement, *i.e.*, the SOW. (DE 77-2 at ¶ 26).

### C. The Statement of Work

The following sections of the SOW are most pertinent to the analysis.

Section Two of the SOW's "Project Scope," titled "Description of Process," states:

> An Agile development process that is iterative and adaptable will be implemented. The process will be conducted around daily Scrum meetings held by the Agency with the Client, with the objective of keeping the team focused and lean but scalable with cost controls.
> a. Each sprint of the project will be discussed and outlined during the Scrum meetings.
> b. The goal of each meeting will be to have developer conversations that result in clear direction and Business Partner (Client) approval for the subsequent module daily development.
> c. As a section or module development is completed, the module of code will be tested to ensure that it works as intended and in concert with rest of application.
> d. Sprint timing will vary and differ by size and scope of each incremental 'sprint' or phase of the build.

(SOW 1).

Section Three of the same "Project Scope," titled "Invoicing and Accounting" states:

> Monthly invoices will be submitted for the duration of the project.
> a. An initial dollar amount will be used at the start of the project. If that dollar amount is either too great or too small either the resources or dollar amount invoiced for will be adjusted to more closely align to each other.
> b. Agency will track time and fees against the project scope on a bi-weekly basis and review with the client.

(SOW 2).

3

Under "Project Costs," the SOW provides:

> Agency will work with Client on a time and materials basis pursuant to a blended rate of $150, per person, per hour for the tasks associated with rebuilding the application. Agency shall bill Client in advance, in $30,000 monthly payments, as further outlined below. Agency will track time and fees against the Project Scope on a bi-weekly basis and review with Client.
>
> The estimate contained in this SOW assumes no out of pocket costs. Any out of pocket costs require Client's approval prior to incurring such costs. If approved by Client, Agency shall bill Client for the actual cost of expenses, without markup.

(Id.).

Damages are limited: "Under no circumstances shall Agency be liable under this SOW, whether in tort, contract, negligence, strict liability, warranty or under any other legal theory, for losses in an amount exceeding the total fees collected for this SOW." (SOW at 6). The SOW includes an integration clause (SOW 6), and a requirement of thirty days' advance written notice of termination. (SOW at 5).

### D. The Project

Havas began rebuilding the website immediately after the SOW was signed. (DE 77-2 at ¶ 1).

In October of 2012, the parties met to discuss "the Agile definition and development process," the technology used, and the information needed to develop the website. (DE 77-2 at ¶¶ 99, 100). The parties, again, dispute whether Havas gave assurances regarding the duration or cost of the project. (DE 77-2, 83-2 at ¶ 102).

After the execution of the SOW, Flanagan indicated that he intended to "re-[e]nvision the automation that supported [Accurate's] business" and consider the improvements and efficiencies that could be made to its existing website. (DE 83-2 at ¶¶ 116–117). Havas and Accurate dispute whether Accurate's decision to add new features and improvements affected the cost and time it would take to complete the project. (DE 77-2, 83-2 at ¶ 122).

4

Accurate asserts that such features and improvements were already baked into the pricing: "Adding new features to the website envisioned were considered in the pricing and duration proposed for the project." (DE 83-1 at ¶ 122).

Beginning November 2012, Havas wrote and published the project's source code to an online repository, (DE 77-2 at ¶ 125), which was owned by a company called Beanstalk (DE 77-2 at ¶¶ 126–127). Accurate, which hired Beanstalk through its consultant, Cloudstar, was always able to access the code in the Beanstalk repository. (DE 77-2 at ¶¶ 127, 129). Havas, however, had no control over the Beanstalk repository. (DE 77-2 at ¶ 131). Through Cloudstar, Accurate also hired Peak 10 to host the development and staging environment for the project. (DE 77-2 at ¶¶ 134–139).

As Havas continued working, the parties met weekly to discuss the project's status. (DE 77-2 at ¶¶ 145–146). Accurate asserts that the project's regular meetings were not "scrum meetings" as allegedly required under the SOW. (DE 83-2 at ¶¶ 144–152). Havas, however, asserts that these meetings complied with the requirements of the SOW. (DE 77-2 at ¶¶ 144–170).

In January 2013, Havas started the next phase (the "second phase") of the project by bringing in developers to create screens, information architecture, and case flows. (DE 77-2 at ¶ 172).

Here the parties' largely parallel accounts tend to diverge more. It is undisputed that, at the beginning of the second phase, Accurate requested changes to the project, which caused Havas to adjust its work on the rebuild. (DE 77-2 at ¶¶ 187, 191). Havas contends that similar requests continued throughout the project (DE 77-2 at ¶¶ 192, 226–230); Accurate, however, contends that Flanagan's only additional requests were to minimize the project because Havas's work was already delayed. (DE 83-2 at ¶¶ 192, 226–230).

Havas says that it provided Accurate with regular updates throughout the project. (DE 77-2 at ¶ 220) Accurate, however, asserts that regular updates did not occur. (DE 83-2 at ¶ 220).

In April 2013, Accurate gave Havas approval to increase the pace of the development. (DE 77-2 at ¶ 225).

5

Around May 2013, Flanagan communicated to Havas his concerns about the project's cost and duration. (DE 77-2 at ¶ 231).

Around the same time, Flanagan and Dios came to the belief that Havas was not following the Agile method. (DE 77-2 at ¶ 232).

In early June, 2013, Havas sent Accurate an Excel sheet of top-level estimates of costs and the time range to complete various aspects of the project. (DE 77-2 at ¶¶ 244–245). The spreadsheet cited top-level costs between $702,300 and $1,142,400. (DE 77-2 at ¶ 246). Accurate authorized Havas to continue working on the project. (DE 77-2 at ¶ 252). Accurate states that it did so only based on Havas's stating that the project would be completed imminently. (DE 83-2 at ¶ 252).

In late August 2013, Havas estimated that it would cost between $1,200,000 and $1,500,000 to complete the project. (DE 77-2 at ¶ 271). Accurate, again, authorized Havas to continue working on the project. (DE 77-2 at ¶ 278). Again, Accurate states that it did so because of Havas's assurances of completion. (DE 83-2 at ¶ 278).

In October 2013, Flanagan emailed Hall to "keep the tempo and pace up for the main application rebuild." (DE 77-2 at ¶¶ 312–313). In November 2013, Dio authorized Havas to continue to work on the project. (DE 77-2 at ¶ 333). Finally, in December 2013, the parties discussed putting the project on hold. (DE 77-2 at ¶ 339). According to Havas, by the end of that month Havas stopped working on the project. (DE 77-2 at ¶ 340).

Accurate has not paid Havas's invoices from September 2013 through December 2013. (DE 77-2 at ¶¶ 323–327).

## II. JURISDICTION

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.[3] (Am. Compl. ¶ 7; *see* 28 U.S.C. § 1332(a)).

## III. LEGAL STANDARDS

### A. Summary judgment standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a Court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at

---

[3]  Complete diversity is alleged and not denied. In the opinion dated October 14, 2015, I directed the parties to conduct discovery regarding the citizenship of both LLCs' members. (DE 27, 5 n.2). Neither side contends that the citizenships of the two LLCs' members overlap.

7

248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp.2d 463, 468–69 (D.N.J.2002) (citing *Weissman v. U.S.P.S.*, 19 F. Supp.2d 254 (D.N.J.1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp.2d 168, 184 (2009); *Williams v. Philadelphia Hous. Auth.*, 834 F. Supp. 794, 797 (E.D.Pa.1993), aff'd, 27 F.3d

560 (3d Cir.1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir.2008) (internal quotation and citations omitted).

### B. Breach of contract standard

Under New Jersey law,[4] to establish its breach of contract claim, a plaintiff must prove four elements: (1) the parties entered into a valid contract; (2) the plaintiff performed under the contract; (3) the defendant breached the contract; and (4) the defendant's breach caused damages to the plaintiff. *Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016).

"If the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect." *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014) (internal citations omitted). "A court has no power to rewrite the contract of the parties by substituting a new or different provision from what is clearly expressed in the instrument." *E. Brunswick Sewerage Auth. v. E. Mill Associates, Inc.*, 365 N.J. Super. 120, 125, 838 A.2d 494, 497 (App. Div. 2004). In general, particularly where an agreement contains an integration or merger clause, the parol evidence rule "prohibits the introduction of evidence that tends to *alter* an integrated written document." *Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. 259, 268 (2006) (emphasis added). At the same time, however, "evidence of the circumstances is always admissible in aid of the *interpretation* of an integrated agreement." *Conway*, 187 N.J. at 269 (internal citations omitted, emphasis added); *see Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 419 (3d Cir.

---

[4]  The SOW does not include a choice-of-law provision. Both parties cite to New Jersey law, and I likewise will assume its applicability.

9

2013). "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *In re New Valley Corp.*, 89 F.3d 143, 150 (3d Cir. 1996).

"In a contract interpretation action, summary judgment is appropriate only where the contractual language is unambiguous—*i.e.*, 'subject to only one reasonable interpretation.'" *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013) (citations omitted); *see In re New Valley Corp.*, 89 F.3d 143, 152 (3d Cir. 1996). ("An ambiguous contract is one capable of being understood in more senses than one."). Applying the principles discussed above, "courts must consider all relevant evidence to determine if any ambiguity exists and, if the contested provisions fall in that gray area, summary judgment is improper." *Mylan*, 723 F.3d at 418.

## IV. ACCURATE'S BREACH OF CONTRACT CLAIM

Havas's summary judgment motion argues that Accurate's contract claim should be denied, either because Havas did not breach the SOW or because Accurate waived any such breach. These grounds raise issues of fact that preclude summary judgment. The following discussion does not necessarily exhaust the possible triable issues, but sufficiently demonstrates that summary judgment is not appropriate.

### A. Issues re: Invoicing, Change in Scope, Project Scope

A finding that Havas did or did not breach may depend on the resolution of three facial disputes of fact regarding invoicing and the scope of the project:

1. The Invoicing and Accounting section requires Havas to submit monthly invoices throughout the duration of the project. (SOW 2). Whether Havas met this obligation remains disputed. (DE 96-1, DE 98-1 at ¶¶ 396–401).
2. The Change Order Process section requires Havas to provide Accurate with a change order for approval "if a change in scope associated with

10

this SOW is identified or requested." Whether a change in scope occurred remains disputed. (DE 96-1, DE 98-1 at ¶¶ 382, 395).

3. The Project Scope section states that "the process will be conducted around daily Scrum meetings held by the Agency with the Client with the objective of keeping the team focused and lean but scalable with cost controls." (SOW 1). Whether Havas failed to perform this obligation remains disputed. (DE 77-2, DE 88-2 at ¶¶ 144–170).

### B. Issues re: Agile, Time and Materials, Biweekly Tracking

Issues regarding the Agile method, time-and-materials billing, and biweekly tracking of costs also are disputed, but require a little more discussion. First, I consider Havas's obligation to work on the project following a certain "Agile development process," the meaning of which is subject to conflicting expert testimony. Second, I consider whether Havas was obligated to complete the project by a certain date or within a certain budget. Finally, I consider Havas's alleged obligation to track and review fees on a bi-weekly basis.

#### 1. Agile development process

Accurate argues that Havas failed to use the "Agile development process"[5] as required by the Description of Process section of the SOW. (DE 83-1, 24–26). By not following the Agile method, says Accurate, Havas (1) caused the project to continue indefinitely and to exceed Accurate's budget; and (2) failed to produce any usable software. (DE 98, 15). Havas argues that it did use the Agile development process as agreed, and therefore did not breach the SOW. (DE 77-1 at 21–23; SOW, 1, § 2).

---

[5] The parties and experts use "agile development process" interchangeably with the term "agile method," or, will often short-hand the term as an adjective (e.g., being "agile"). The agile method is a software coding methodology founded in a document known as the Agile Manifesto. (DE 77-2, ¶ 55).

11

Despite some minimal description in the surrounding provisions of the SOW—*i.e.*, that to comply, a process must be both "agile" and "adaptable"—the term "Agile development process" is ambiguous.

Expert witnesses for both sides have set forth detailed and plausible, although conflicting, opinions concerning the requirements of the Agile method.[6] I need not parse each of the numerous disputes over the meaning of "agile development process." It is enough to cite two examples:

First, the experts dispute the role and requirements of "sprints" under the agile method. Havas's expert contends that, under the agile method, it is not required to produce working, releasable code after each sprint, nor are

---

[6] I will address two preliminary or housekeeping issues regarding the expert reports of Accurate's expert, Rick Dove ("Dove"):

First, Accurate cites, but neglected to e-file, the "Amended Expert Report of Rick Dove" (hereinafter, "Dove's Amended Report") as Exhibit G to its Response in Opposition and Motion for Summary Judgment. (*see* DE 83, 84, 85, 86). However, Accurate did send the exhibit by courtesy copy. The record shows that Havas possessed and was aware that Accurate relied on this document. First, Havas has filed a motion to strike, (DE 59; *see also* DE 68), and a motion for attorney fees, (DE 78; *see also* DE 101), related to Dove's Amended Report. Second, as an exhibit to Havas's own motion for summary judgment, Havas supplies an expert report in rebuttal to Dove's Amended Report. An e-filing of Dove's Amended Report may be found in [DE 78-3]. Thus, citations to "Ex. G to DE 83, [page no.]" may be tracked to DE 78-3.

Second, Havas alleges throughout its briefing that, because Dove allegedly failed to review the source code, his expert opinion is not reliable. (*See* DE 77-2, ¶ 143). In his amended expert report, however, Dove explains why, in his opinion, a review of all source code was not necessary to render his opinion. (Ex. G to DE 83, 5). All of that considered, "[a]ny issues of credibility must be left to the finder of fact." *Akhtar v. JDN Properties at Florham Park, L.L.C.*, 439 N.J. Super. 391, 399 (App. Div. 2015).

12

sprints necessary at all. (DE 77-16, 8).[7] Accurate's expert replies that frequent sprints are expected under the agile method. (Ex. G to DE 83, 7)[8]

Second, Accurate's expert contends that, under the agile method, Accurate had the right to expect, even before the project was fully complete, usable, income-generating releases of the product. (Ex. G to DE 83, 3).[9] Havas's expert asserts to the contrary that the agile method does not create a

---

[7] An excerpt from Havas's expert report gives one perspective on the sprint issue:

> A sprint is a concept popularized by the Scrum software development process. In short, a sprint is a period of a few weeks over which a discrete set of tasks are tackled. In many implementations of Scrum the end of a sprint brings with it working software, sometimes even releasing it to customers. *While some implementations of Scrum may involve working in sprints and releasing code to customers after each one, doing so is not a requirement of being Agile or even of doing Scrum. In fact it is entirely possible to be Agile without working in sprints at all.* The word sprint doesn't appear anywhere in the Agile Manifesto.

(DE 77-16, 8) (emphasis added). Note, however, that Section Two of the Project Scope references to "sprints" in both subsections (a) and (d). ((SOW, 1, § 2(a), (d)) ("Each sprint of the project will be discussed and outlined during the Scrum meetings . . . Sprint timings will vary and differ by size and scope of each incremental 'sprint' or phase of the build.")).

[8] Compare Havas's expert report, *supra* n.7, to this excerpt from Accurate's expert report:

> Scrum development concepts prescribe a 2[-]4 week Sprint. Agile development concepts in general recognize that Sprints may be shorter or longer than what Scrum prescribes, but not so long as to jeopardize the ability to affordably alter what has already been produced . . . *[T]he expected agile practice is frequent Sprints that produce progressively more "working" software which can be operationally evaluated at the end of each Sprint*, to provide feedback for subsequent iterative improvement.

(Ex. G to DE 83, 7) (emphasis added).

[9] Accurate's expert report states:

> Plaintiff had a right to expect an agile development process with value to Plaintiff in the form of incremental development of an operational "release" that could be employed by Plaintiff's clients as an income-generating application before the entire envisioned product was implemented in releasable form.

(Ex. G to DE 83, 3).

13

legitimate expectation of any such usable and income-generating interim product releases. (DE 77-16, 8).[10]

The parties of course agree that the SOW's Description of Process governs. That process, however, incorporates a methodology which is subject to reasonable divergent interpretations. This material ambiguity precludes summary judgment.

### 2. Time and materials provisions
#### a. The gap in the SOW

The SOW does not contain an explicit termination date or set a fixed cost for the project. (DE 77-1, 18–21; DE 96, 3). Rather, says Havas, the SOW states that Havas will work with Accurate on a "time and materials basis." (DE 77-1, 18; SOW 2). It follows, according to Havas, that it is not in breach as a result of time and cost overruns.

In opposition, Accurate asserts that the "time and materials" provision is ambiguous. (DE 83-1, 21–26; DE 98, 10–15). That ambiguity, says Accurate, trumps the integration clause; it permits the Court to resolve the ambiguity by treating the parties' alleged extrinsic discussions and understandings about time and fees as supplemental contract terms. (DE 83-1, 21–26); (DE 98, 10–15). In particular, Accurate cites the Dios Declaration, which cites contemporaneous conversations in which Havas supposedly estimated that the cost would be $350,000 to $750,000, and that the project would take six months. (DE 83-1, 22). In reply, Havas argues that the Dios declaration

---

[10] Compare Accurate's expert report, *supra* n.9, with this excerpt from Havas's expert report:

> In the case of the Accurate Abstracts web application it would not make sense for Accurate Abstracts to release the product to customers when it was still in its infancy. Even if Havas delivered code that was ready to "go-live" every few weeks Accurate Abstracts would be extremely unlikely to generate revenue from it until it was substantially completed. There is nothing magical about Agile that allows developers to create a fully functional product almost immediately.

(DE 77-16, 8).

14

conflicts with Dios's prior statements affirming her understanding of the "time and materials" provision. Regardless, it cannot be denied that the SOW does not list a budget range of $350,000 to $750,000 or set a deadline.

A prerequisite of Accurate's argument is that there be an ambiguity in the contract. In that regard, Accurate points to language elsewhere in the SOW that allegedly conflicts with the term "time and materials." First, the Invoice and Accounting section (and Project Cost section) require Havas to "track time and fees against the project scope on a bi-weekly basis and review with client." (SOW 2). Such controls, Accurate argues, imply budget limitations. (DE 98, 10, 14). Not really; indeed, such oversight may be critical to a time-and- materials contract precisely *because* there is no budget ceiling. Second, the Accounting Section states that "[t]he estimate contained in this SOW assumes no out of pocket costs." (SOW, 2). Accurate argues that the term "estimate" conflicts with the term "time and materials" and renders it ambiguous. (DE 98, 10–14). I disagree. A passing mention of the term "estimate" does not negate the explicit agreement to bill on a "time and materials" basis.[11]

More generally, Accurate contends that the industry standard is "for projects to be subject to a budget and not go on forever." (DE 98, 11–12). Even so, the plain language of the Project Cost section sets forth a time-and-materials agreement with no explicit cap on fees or projected time of completion. Had the parties intended to include a time of completion, a "not-to-exceed" price arrangement, or a budget range, they were free to do so explicitly. They did not.[12]

---

[11] Read in context, "estimate" may simply refer to the items billed in advance at $30,000 per month, as opposed to out-of-pocket costs, which must be pre-approved.

[12] Such a payment cap is a well-known, available option. *See, e.g., Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*, No. C07-02499 JCS, 2009 WL 330259 at *7 (N.D. Cal. Feb. 10, 2009) (discussing a time and materials contract with an explicit payment cap). Other options are available as well:

> You can negotiate pricing for [software installation consulting and modification services] in three major ways: fixed price, not-to-exceed price, or time and materials pricing. . . . In [a time and materials] arrangement, the vendor charges by the hour or the day, as well as for any expenses

I therefore do not find that the parties included an ambiguous term in their written agreement that must be resolved in light of contemporaneous oral statements. I am nevertheless in agreement with the premise of Accurate's argument: that the project could not have been expected to go on forever at unlimited cost. As to that concern, however, the SOW is silent; there is not an ambiguity, but rather a gap, in the SOW.

### b. Implied reasonable time provision

That gap may be filled, not with disputed oral statements or one party's subjective impressions, but with implied, reasonable terms. Where a contract is formed but is silent about a term necessary to its operation, reasonable terms may be implied, "for the reason that the parties must have intended them and have only failed to express them." *Barco Urban Renewal Corp. v. Hous. Auth. of City of Atl. City*, 674 F.2d 1001, 1007 (3d Cir. 1982). "An agreement . . . must be accorded a rational meaning in keeping with the express general purpose. The most fair and reasonable construction, imputing the least hardship on either of the contracting parties should be adopted . . . so that neither will have an unfair or unreasonable advantage over the other." *Carter v. Exxon Co. USA, a Div. of Exxon Corp.*, 177 F.3d 197, 206 (3d Cir. 1999) (internal citations omitted).

One such omitted term, as in this case, is a deadline. Nothing is forever, and the courts will often find that some reasonable time limit must be implied. It is a "well-established principle of New Jersey law . . . that '[w]here no time is fixed for the performance of a contract, by implication a reasonable time was

---

> incurred. Payment is usually made weekly or monthly for charges incurred during the previous billing period. In this case, the accuracy and completeness of the statement of work is less important, but there is no cap on the fees for completion of the services. You might want to consider using more than one method for pricing a complex project, such as using a not-to-exceed or time and materials pricing format to establish the statement of work for the larger project, which would then occur on a fixed or not-to-exceed price structure.

An Introduction to Software Licensing, ACCA Docket, OCTOBER 2002, at 54, 62.

16

intended.'" *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 284 (3d Cir. 2000) (quoting *Becker v. Sunrise at Elkridge*, 226 N.J. Super. 119, 543 A.2d 977, 983 (App. Div. 1988)). The same reasoning applies to the project's cost.

The SOW does not fix any outside time limit for performance or cap the cost of the project. It is true, of course, that a time-and-materials scheme may be adopted precisely *because* a project's duration and cost are unpredictable. (*See* 77-2 at ¶ 46). And it is also true that the SOW grants an exit strategy, in the form of a thirty-day termination clause. (DE 77-2 at ¶ 86). Even so, the parties necessarily entered into the agreement with the mutual expectation that the project would be completed within some reasonable period of time short of eternity at some cost short of the GNP. Accurate would not reasonably agree to be strung along forever, a prisoner of its sunk costs; Havas would not reasonably expect to be paid indefinitely while producing nothing usable. A reasonable outside time limit must—or at the very least, *could*—be implied by a finder of fact.[13]

"What constitutes a reasonable time under New Jersey law is usually an implication of fact, and not of law." *Barco Urban Renewal Corp. v. Hous. Auth. of City of Atl. City*, 674 F.2d 1001, 1008 (3d Cir. 1982) (internal citations omitted). Whether and to what extent such a time limit can be implied presents an issue of fact, precluding summary judgment.

### 3. Biweekly tracking of time and fees

Havas was obligated, under both the Invoicing and Accounting section and Project Costs section of the SOW, to "track time and fees against the project scope on a bi-weekly basis and review with [Accurate]." (SOW, 2). This term is ambiguous. Accurate and Havas agree that the provisions require

---

13    Moreover, if the fact-finder were to find that Havas was obligated to complete sprints of the project with some frequency, discussed *supra*, it might also find that the parties intended that each sprint be completed within a reasonable period of time.

17

Havas to *track* the time and fees on a bi-weekly basis (DE 96, 4; DE 98, 6), but they dispute whether the provision requires Havas to *review* time and fees *with Accurate* on a bi-weekly basis (DE 96, 5; DE 98, 6). The construction of the sentence may reasonably lend itself to either interpretation ("bi-weekly" could plausibly refer only to "track," or also to "review"). Neither Havas nor Accurate provides a basis to choose its preferred interpretation as a matter of law.

### C. Waiver and estoppel

Havas, assuming *arguendo* that it breached, has interposed the defenses of waiver and estoppel. It points to statements and conduct by which, it says, Accurate acquiesced in Havas's conduct. That defense poses obvious, glaring factual issues regarding the meaning and intent of such statements and actions. Summary judgment will not be granted on this basis.

## V. OTHER ISSUES

Havas seeks summary judgment on its own counterclaim for breach of contract, which is based on Accurate's having failed to pay invoices for September–December 2013. (DE 77-1, 29–30; DE 96, 15–18). I have already found, however, that there is a factual issue as to whether Havas performed under the contract. On the current record, then, there is a triable factual issue as to whether Accurate's duty to pay was excused by Havas's prior breach.

Accurate has moved for summary judgment on both Havas's and its own breach of contract claim. (DE 83-1). The issues of fact identified above, however, were not mere unilateral failures of proof, but actual, two-sided conflicts in the evidence.

For the reasons stated above, I deny these mirror-image summary judgment motions.

## VI. Conclusion

For the reasons set forth above, Havas's motion for summary judgment (DE 77), is DENIED and Accurate's cross-motion for summary judgment (DE 83) is DENIED. An appropriate order follows.

Dated: October 16, 2018

_____
**Kevin McNulty**
**United States District Judge**